UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES W. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 6281 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| GHALIAH OBAISI, the Independent Executor | ) | |
| of the Estate of Saleh Obaisi,[1] and WEXFORD | ) | |
| HEALTH SOURCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Charles W. Campbell, an inmate at Stateville Correctional Center ("Stateville"), suffers from lower back pain. He filed this 42 U.S.C. § 1983 suit against Defendants Dr. Saleh Obaisi, now deceased, and Wexford Health Sources, Inc. ("Wexford"), alleging that Dr. Obaisi and Wexford exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Defendants seek summary judgment on Campbell's claims. Because Campbell cannot establish that Dr. Obaisi acted with deliberate indifference to his lower back condition, the Court grants summary judgment for the executor of Dr. Obaisi's estate. Similarly, because Campbell has not established a question of fact as to whether Wexford's alleged practice of scheduling outside referrals based on the urgency of the inmate's medical condition caused him harm, the Court grants summary judgment for Wexford.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(a)(1), the Court substituted Ghaliah Obaisi, the executor of Dr. Saleh Obaisi's estate, in place of the deceased Defendant Dr. Saleh Obaisi. *See* Docs. 64, 68, 69.

# BACKGROUND[2]

Campbell is a sixty-three year old inmate housed at Stateville. Dr. Obaisi, now deceased, served as the medical director at Stateville during the relevant time period. Wexford, a private corporation that has contracted with the Illinois Department of Corrections to provide medical services to inmates at Stateville, was his employer.

On October 1, 2013, during a medical evaluation with Dr. Obaisi, Campbell complained of lower back pain. Dr. Obaisi prescribed Campbell Mobic 7.5 mg and Protonix 40 mg, both to be taken twice a day for two months. During a follow-up visit on February 20, 2014, Dr. Obaisi diagnosed Campbell with chronic low back pain radiating to his right leg. Dr. Obaisi ordered an x-ray of the lumbar spine and gave Campbell a Depo-Medrol 80 mg injection. Campbell had the x-ray on February 27, 2014, which revealed degeneration of the L4-L5 disc. At a follow-up appointment on April 17, 2014, Dr. Obaisi prescribed two tablets of Tylenol #3 with codeine to be taken twice a day for thirty days. Campbell did not show up for his next appointment with Dr. Obaisi on April 28, but Dr. Obaisi did submit a request that day to send Campbell to UIC for an orthopedic evaluation. Wexford approved that request. On May 12, Dr. Obaisi prescribed Campbell Mobic 7.5 mg to be taken twice a day for ninety days and two tablets of Tylenol #3 with codeine to be taken twice a day for sixty days. Dr. Obaisi also told Campbell that Wexford approved him for an orthopedic evaluation at UIC.

Campbell again saw Dr. Obaisi on July 15, complaining of pain in his right lumbar area. Dr. Obaisi gave Campbell a Depo-Medrol 80 mg injection and prescribed Mobic 7.5 mg and two tablets of Tylenol #3 with codeine, both to be taken to be taken twice a day for ninety days. Dr. Obaisi noted in Campbell's medical records that Campbell was still waiting for his orthopedic

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts. All facts are taken in the light most favorable to Campbell, the non-movant.

consultation. Several months later, on November 11, Campbell again saw Dr. Obaisi with complaints of lower back pain. Dr. Obaisi prescribed Campbell Naproxen 500 mg, a nonsteroidal anti-inflammatory drug, to take twice a day for four months, and scheduled him for a steroid injection. Because Campbell still had not been called by UIC for his orthopedic consultation, Dr. Obaisi submitted a second request, noting that Campbell had already received approval in April 2014. Wexford again approved the request on November 18. That same day, Campbell received the ordered steroid injection of Depo-Medrol 80 mg, at which time Dr. Obaisi also again prescribed Tylenol #3 with codeine for fourteen days.

On February 3, 2015, Campbell saw Dr. Obaisi and complained of pain in his right lower back and hip. Dr. Obaisi prescribed Robaxin 500 mg to be taken twice a day for thirty days. Dr. Obaisi also told Campbell that his orthopedic evaluation at UIC had finally been scheduled. On March 13, Campbell was sent to UIC for that evaluation with Dr. Anis Mekhail, who recommended that Campbell obtain an MRI of his lumbar spine.

Dr. Obaisi testified that UIC handled the scheduling of outside referrals and so the delay in sending Campbell to UIC for his orthopedic evaluation was attributable to UIC's scheduling department. Dr. Obaisi's understanding was that UIC triages requests for appointments based on their urgency. Although he acknowledged that he sometimes would have his secretary contact a liaison at UIC, Barbara Johnson, concerning scheduling delays, and thought he may have called UIC about Campbell's initial appointment, he did not have any documentation to support such calls in this case. Dr. Obaisi testified that, of all referrals he made to UIC, the most common were those to the orthopedic department.

Acting on Dr. Mekhail's recommendation, on March 16, Dr. Obaisi submitted a request to have Campbell sent to UIC for an MRI and follow-up, which Wexford approved on March 19.

3

Campbell saw Dr. Obaisi on March 23, and he had an MRI of his lumbar spine at UIC on May 12. On May 18, Campbell saw Dr. Obaisi again, who issued him a permit to use a crutch for ninety days. Several days later, on May 22, Campbell returned to UIC for an orthopedic evaluation with Dr. Gary Edwards. Campbell's MRI showed a central L4-L5 disk herniation and L3-L4 severe right-sided neural foraminal stenosis with multilevel degenerative changes. Dr. Edwards recommended physical therapy for six to eight weeks and a follow-up appointment in two months to evaluate Campbell's progress. Dr. Obaisi sought approval for the orthopedic follow-up on June 1. And Campbell attended approximately ten physical therapy appointments between June 9 and July 27.

On July 7, Dr. Obaisi gave Campbell a Toradol 60 mg injection for his complaints of significant back pain. Campbell testified that the Toradol shots helped alleviate his back pain. But Campbell again complained of back pain to Dr. Obaisi on August 18, at which time Dr. Obaisi prescribed Mobic 7.5 mg and two tablets of Tylenol #3 with codeine for ninety days. On September 21, Dr. Obaisi resubmitted his request to have Campbell seen for a follow-up orthopedic consultation at UIC, which Wexford approved on October 5. On December 1, Campbell again presented to Dr. Obaisi with complaints of back pain. Dr. Obaisi continued the Tylenol #3 with codeine and Mobic prescriptions for another ninety days and also gave Campbell a Toradol 60 mg injection.

On May 13, 2016, Campbell finally returned to UIC for an orthopedic follow-up with Dr. Mekhail, who recommended that Campbell be sent to a pain clinic for a possible epidural steroid injection. Dr. Mekhail also recommended a neurology consultation for possible neuropathy. Dr. Obaisi submitted requests on May 17 to send Campbell to UIC for both pain clinic and neurology consultations. Wexford approved both requests on May 26. Meanwhile, on May 19,

Dr. Obaisi prescribed more pain medicine for Campbell, continuing his prescription of Tylenol #3 with codeine for another six months.

On September 7, Campbell went to UIC for a pain clinic evaluation with Dr. Khalid Malik, who recommended giving Campbell a lumbar epidural steroid injection, which he provided that day, and increasing Campbell's prescription of gabapentin to 300 mg three times a day. On September 13, Dr. Obaisi submitted a request to send Campbell back to UIC for a pain clinic follow-up, which Wexford approved on September 21. On November 16, Dr. Obaisi again refilled Campbell's Tylenol #3 with codeine prescription for another three months.

On December 8, Campbell had his neurology consultation at UIC with Dr. Neelofer Shafi, who diagnosed Campbell with neuropathy. Dr. Shafi provided a prescription for an additional crutch and suggested physical therapy for a gait assessment. On December 13, Dr. Obaisi issued Campbell a four-month medical permit for two crutches. Campbell testified that he had requested a second crutch for almost a year, but Dr. Obaisi did not recall ever receiving such a request from the Stateville nurses. Dr. Obaisi also did not receive notification that Campbell had filed a grievance requesting two crutches.

Further following Dr. Shafi's recommendations, on December 14, Dr. Obaisi submitted requests for Campbell to have an EMG of his four extremities at UIC and for physical therapy. Wexford approved the request for the EMG on December 22, and Campbell had the EMG at UIC on January 25, 2017. Dr. Lawrence Zeidman found evidence of polyneuropathy typical of that seen in diabetic patients.

On February 27, 2017, Dr. Obaisi issued Campbell a six-month medical permit for low bunk, low gallery, two crutches, three showers per week, and slow walk. The permit also allowed Campbell to have ice three times a day for thirty days. On March 1, Dr. Obaisi

requested that Campbell be sent to UIC for a neurology follow-up, which Wexford approved on March 8. That same day, Campbell had a medial branch radio frequency ablation at UIC, and he returned to UIC on March 22 for a neurology follow-up. The neurologist recommended increasing his gabapentin dosage, which occurred that same day. On April 6, Dr. Obaisi issued Campbell a revised six-month medical permit for low bunk, low gallery, two crutches, daily showers, slow walk, ice twice a day, a double mattress, and no stairs.

As the medical director at Stateville, Dr. Obaisi did not review the written requests inmates made for medical care. He also did not review any of Campbell's grievances about his lower back. According to Dr. Obaisi, Campbell's lower back condition was not life-threatening or a threat to his health in general. Instead, Dr. Obaisi considered lumbosacral disc herniation a relatively common condition. He also testified that he did not believe that Campbell's condition worsened during his wait for appointments at UIC and that as long as Campbell controlled his blood sugar, his lower back condition would remain stable.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue

for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

Health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both an objective and a subjective element: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The parties do not dispute that Campbell suffered from an objectively serious medical condition for purposes of this motion, so the Court only addresses the subjective element of Campbell's deliberate indifference claim against Dr. Obaisi and Wexford.

The subjective element of a deliberate indifference claim requires that the defendant act with a sufficiently culpable state of mind—"something akin to criminal recklessness"—requiring "that the defendant be aware of and disregard an excessive risk of serious harm to the inmate." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). "For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'"

7

*Holloway v. Del. County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)). Neither negligence nor gross negligence constitutes deliberate indifference. *Farmer*, 511 U.S. at 836.

**I.  Dr. Obaisi**

Campbell argues that Dr. Obaisi acted with deliberate indifference because Dr. Obaisi did not ensure that Campbell saw outside specialists for his back pain within reasonable time periods, causing him not to receive proper medical treatment during this time. The Court must consider Campbell's treatment as a whole instead of in pieces, however. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs."). Looking at the totality of Campbell's treatment, the Court cannot find that Dr. Obaisi exhibited a pattern of neglect toward Campbell. Dr. Obaisi pursued a comprehensive treatment plan for Campbell's lower back pain, prescribing pain and anti-inflammatory medication and injections and referring him to a number of specialists. Dr. Obaisi then implemented those specialists' recommendations, pursuing additional referrals and treatment for Campbell. *Cf. Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist."). And Campbell received physical therapy and numerous accommodations, including crutches, lower bunk and gallery permits, and double mattresses. Although Campbell may have desired different care, or more immediate attention by a specialist, as an inmate, he is not entitled to "demand specific care" or "the best care possible," and, here, the Court cannot find that Dr. Obaisi's care deviated from the acceptable standard of care. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmate not entitled to "demand specific care" or to "the best care possible," although he is
8

"entitled to reasonable measures to meet a substantial risk of serious harm"); *Jackson*, 541 F.3d at 697 (because "[t]here is not one 'proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field . . . [a] medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances'" (citations omitted) (internal quotation marks omitted)).

As for Campbell's complaints regarding the scheduling of appointments at UIC, "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016); *see also Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." (citation omitted)). Campbell takes issue with the delay between Dr. Obaisi's referral for an orthopedic evaluation at UIC in April 2014 and the initial visit with the orthopedic specialist on March 13, 2015. During this eleven-month time period, Campbell continued complaining of back pain to Dr. Obaisi, prompting Dr. Obaisi to prescribe him pain and anti-inflammatory medicine and again submit another referral request for Campbell to have his orthopedic evaluation. Campbell also complains of a second delay, which occurred after Dr. Edwards recommended a two-month orthopedic follow-up in May 2015. Dr. Obaisi submitted requests for this follow-up on June 1, 2015 and September 21, 2015,

which Wexford approved on October 5, 2015. But Campbell did not return to UIC for another orthopedic appointment until May 13, 2016.

Campbell argues that these delays exacerbated his condition, with him needing one crutch in May 2015 and then two crutches in December 2016, receiving Toradol injections in July and December 2015, and ultimately being diagnosed by a neurologist in December 2016 with neuropathy. But Campbell does not present any independent evidence, either through an expert or in his own medical records, that these issues can be traced to the delay in the appointments. Instead, the parties agree that Campbell's lower back condition is not life-threatening and does not present a threat to his health. Moreover, Dr. Obaisi testified that Campbell's condition did not worsen over these periods, and Dr. Obaisi continually treated it with pain and anti-inflammatory medicine and injections in response to Campbell's complaints during appointments. Although Campbell suggests that Dr. Obaisi could have referred Campbell for physical therapy earlier instead of waiting for the orthopedic specialist to recommend physical therapy, Campbell does not present any evidence that the delay in physical therapy exacerbated his back condition. Similarly, Campbell's claim that had he been seen sooner he could have received certain epidural and steroid shots or crutches sooner does not make the delays actionable, particularly where Dr. Obaisi provided Campbell with steroid injections before and in between his UIC appointments. Further, nothing in the record suggests that the additional injections or crutches Campbell received after his UIC visits were more effective in alleviating Campbell's pain than the course of treatment Dr. Obaisi followed. *See Harrison v. Wexford Health Sources, Inc.*, 669 F. App'x 797, 799 (7th Cir. 2016) (rejecting argument that Dr. Obaisi's delay in referring plaintiff to specialist for back pain constituted deliberate indifference where plaintiff did not "point[ ] to any evidence in the record reflecting that the

treatment was 'blatantly inappropriate' or otherwise violated professional medical standards" and over the course of treatment before plaintiff saw the specialist, Dr. Obaisi "regularly altered [plaintiff's] prescriptions for pain-relieving, anti-inflammatory, and muscle-relaxing drugs based on [plaintiff's] condition"); *Medrano v. Ghosh*, No. 13 C 84, 2018 WL 1635854, at *3 (N.D. Ill. Apr. 5, 2018) (rejecting argument that delay in referral to see specialist constituted deliberate indifference to plaintiff's back condition where evidence in record indicated that doctor consistently provided plaintiff with pain medication and back condition was chronic); *see also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (noting that "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations," and that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition'" (citation omitted)).

Moreover, the record reflects that Dr. Obaisi was not responsible for the delays in Campbell's appointments at UIC. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (summary judgment appropriate where plaintiff presented no evidence that delay between visit with defendant doctor and specialist was within defendant doctor's control or that the delay contributed to plaintiff's injuries); *Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985, 996–97 (N.D. Ill. 2015) (summary judgment granted for defendant doctors where no evidence they had responsibility for delays in scheduling surgery or specialist visits, even where record indicated one of the doctors knew of the lengthy delays). Dr. Obaisi testified that he had no responsibility for scheduling appointments at UIC, with Stateville relying on UIC to schedule appointments and UIC triaging requests based on the urgency of the condition. The record also

11

reflects that Dr. Obaisi most frequently made referrals to UIC's orthopedic department, suggesting a reason for the long wait time for these appointments. Although Dr. Obaisi did state that he sometimes had his secretary follow up on outstanding appointment referrals but could not document having done so here, he did resubmit requests for the appointments in this case, and nothing in the record would allow a trier of fact to attribute the delay in Campbell's two orthopedic appointments to Dr. Obaisi. Therefore, because Campbell has not shown that Dr. Obaisi's treatment was so inadequate as to rise to the level of a constitutional violation, the Court grants summary judgment for Ghaliah Obaisi, the executor of Dr. Obaisi's estate.

## II.     Wexford

Next, Campbell argues that Wexford has a practice of withholding treatment from inmates by scheduling them for appointments at UIC based on the urgency of their condition, leading to substantial delays and unnecessary pain and suffering. To prevail on his claim against Wexford, Campbell must show that Wexford has an official policy, pattern, or practice that caused a constitutional violation. *See Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (*Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"). Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policy making authority. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation

marks omitted). Although the Court has found that Campbell has no claim against Dr. Obaisi, institutional liability may still be possible where the "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017). But Wexford must cause the alleged failures in care itself; Wexford cannot be held liable on a *respondeat superior* theory of liability for its employees' conduct. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000).

Here, Campbell argues that Wexford should be held liable for the alleged practice of scheduling patients for outside referrals based on the urgency of their condition. His claim fails for several reasons, the first being that the record establishes that UIC, and not Wexford, scheduled the outside referrals from Stateville on this basis. Campbell has not presented any evidence that would allow the Court to hold Wexford liable for the delayed appointments on this basis. Additionally, Campbell's only evidence for this practice is his own experience in having to wait almost a year on two occasions for orthopedic appointments, but on several other occasions, he had more immediate appointments. At the summary judgment stage, Campbell cannot use his isolated experience, particularly in light of the fact that he had other appointments at UIC for the same condition scheduled more promptly, to support a *Monell* claim against Wexford because "[s]uch isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent" to Campbell's needs. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). Therefore, Campbell cannot prevail on his claim

against Wexford, and the Court grants judgment for Wexford on Campbell's deliberate indifference claim against it.[3]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [40]. The Court enters judgment for Defendants on Campbell's amended complaint and terminates this case.

Dated: July 23, 2018

                                              SARA L. ELLIS
                                              United States District Judge

---

[3] Because the Court finds that Campbell cannot establish his deliberate indifference claims, it need not address Defendants' alternative argument that Campbell cannot recover punitive damages against Defendants.